[No. 1885.]

### Ben Lane v. The State.

1. Murder — Fact Case.— See the opinion and the statement of the case for evidence *held* sufficient to support a capital conviction for murder.
2. Practice in the Court of Appeals — Evidence.— When the evidence in a criminal trial is conflicting, and there is sufficient, if believed, to prove the case of the State, the jury being the exclusive judges of the credibility of the testimony, their verdict will not be set aside, unless it clearly appears to be wrong.

Appeal from the District Court of San Augustine. Tried below before the Hon. J. I. Perkins.

This was a conviction for murder in the first degree, the death penalty being assessed against the appellant, for the murder of Sidney Ann Dykes, a female, in San Augustine county, Texas, on the 24th day of December, 1884.

The statement of facts in this case covers nearly sixty pages of the transcript. The opinion briefly summarizes the most important features of the testimony, but, as the appeal is disposed of on the evidence alone, a statement somewhat more in detail is appended.

The State first introduced in evidence the three indictments, numbers 1538, 1576 and 1577, pending against the defendant in the district court of San Augustine county, where the assassination occurred. By the first of these indictments he was charged with an assault with intent to rape Elizabeth Howell; by the second he

was charged with false imprisonment, and by the last with the offense of falsely personating an officer. The name of the deceased appeared on each of these indictments as a witness for the prosecution.

Justice of the Peace James Anderson testified, for the State, that he heard of the murder of Sidney Ann Dykes on Christmas day, 1884,— the day after it occurred. The defendant came to witness's house on Christmas eve, the day before witness heard of the killing, to get some brandy as directed by the doctor, for the use, he said, of his sick wife. He then had a double-barreled shot-gun with him. The deceased and a small boy, called Oliver Gillespie, were at the witness's house on December 23, the day before the killing. Witness remained at home for two hours after their arrival, and left them there. They were gone when the witness returned late on that evening. The deceased said nothing to witness about any official business with him. When the defendant came to witness's house on the next day, he asked the witness if Sidney had procured the issuance of a writ against Dick Dubose. Witness replied in the negative. This, the defendant said, was very strange, as Sidney's business with witness on the day before was to procure the issuance of such a writ. He then left, saying that he was in haste, and would have Sidney at witness's house before 8 o'clock on that night. His manner was abrupt and he seemed vexed. He left witness's house horseback, and in a trot, at precisely 1 o'clock. While at the witness's house on the day previous, the deceased tried to get witness to put her and the boy Gillespie across the Angelina river, which the witness declined to do.

Referring to a plat or diagram of the country surrounding the scene of the murder, the witness testified as follows: "The defendant lived at that time nearly due east of me, about seven miles across the country. It is, however, eight miles by the regularly traveled road. About one mile from my house on the said road stands a school-house, and about six miles from my house, and about four hundred yards from said road, north, is a place called Pretty Prairie. This road at the school-house makes a considerable deflection to the south until it reaches Seaborn Bryant's, a distance of nearly three miles from said school-house, when it again turns and leads off to the northeast until it reaches a point opposite Pretty Prairie, when it again leads in an almost easterly line towards and to the residence of the defendant, Ben Lane. The country on a direct line from this school-house to Pretty Prairie is mostly open piney woods with occasional underbrush. People of the country

often travel through there stock-hunting, but there was no road or trail traversing it. The hypothenuse of the triangle formed by this woods route and the road from the school-house to Seaborn Bryant's house southeasterly, and from said Bryant's to Pretty Prairie northeasterly, is about one mile shorter than the sum of the other two sides. No one lived on this woods route, nor would a person traveling it pass any one's house until reaching the house of the defendant. On the other road from my house to the defendant's, and about three-fourths of a mile from me, lives James Bryant. One Crawford lives near James Bryant. Seaborn Bryant lives between three and four miles from me. The road between the two last houses forks just beyond Seaborn Bryant's house, the right hand fork leading due south about four hundred yards into the San Augustine and Townsend Bluff road. This road "— the right hand fork (?) — "runs nearly north and south, and to the south of this point" — of intersection (?) — "at a distance of a mile or two enters what is known as the Coleman settlement. The left hand turns northeast, crosses the San Augustine and Townsend Bluff road, at the distance of about three hundred yards, and reaches the residence of one Sam Williams, within a half mile; passes that residence and continuing in about the same direction until it reaches a point opposite Pretty Prairie. It is about four miles from my house to Sam Williams's, and about the same distance from Sam Williams's to Ben Lane's. It is one mile from my house to the school-house; about four miles from the school-house to Pretty Prairie by the woods route, and from Pretty Prairie to Ben Lane's it is about two miles. It is also about two miles from Sam Williams's to Pretty Prairie."

The witness, as justice of the peace, on December 26, 1884, held an inquest upon the dead body of Sidney Ann Dykes. The point where the witness viewed the body was in a trail leading from Ben Lane's residence towards the west, and in the direction of which the deceased had lived. It lay about thirty steps from the rear part of the defendant's house, and just outside of the fence inclosing a small piece of recently cultivated land. The body lay on the right side, the legs drawn up a little, and the arms a little to one side. Witness saw nine bullet holes in the right side of the body. The bullets seemed to range downward. There were bruises on the body, those on the back appearing to have been inflicted with a lash. Witness observed cockle-burrs in and along the trail on which the body lay. The witness went to the defendant's house on the night of December 25, 1884, and saw the defendant there that night. De-

fendant remained at home that night and until about sunrise next morning. Witness did not see the defendant after sunrise. His family remained at home. The witness saw at the inquest the same double-barreled shot-gun which, on the 24th day of the month, he saw in the hands of the defendant at the witness's house. One barrel seemed to have been recently discharged, and the other was charged with squirrel shot. While at the fire near the body, on the night of December 25, 1884, the witness heard the report of a gun.

During the proceedings at the inquest, the witness aided other parties in tracing the tracks of a horse from defendant's front gate towards the place where the body lay. The witness made careful observation of the defendant's place, but could find no blood or traces of a scuffle in or about the yard. Defendant invited witness into his house to drink a cup of coffee on the night of December 25, and while witness was drinking it defendant said to his wife: "Now, Jane, tell Mr. Anderson about the killing of Sidney Ann." Mrs. Lane began to relate her version of the killing, but stopped before concluding her narrative, and the defendant, leaning back in his chair, remarked, addressing Mrs. Lane: "Yes, somebody has killed Sidney Ann; and if you don't mind you will be next."

The substance of the testimony of W. S. Massey, one of the inquest jury, was that the nine wounds in the body of the deceased, occupying a space easily covered by a man's hand, were made by ordinary buck shot. They ranged slightly downward, as was demonstrated by probing with a small, smooth, round stick. Four of the buck shot entered the body just above the lower right rib, one struck that rib, and the remaining four passed into the body immediately below the same rib. The body lay, when the witness saw it on the morning of December 26, 1884, on a trail which led from the yard of the defendant's house to an old house a half mile distant, which had been occupied by the deceased. It (the body) lay about thirty steps from the defendant's house. The yard inclosing defendant's place was small, the fence being situated near the house. Between that yard fence and the point where the dead body lay was a small inclosed patch of land which had been cultivated. The trail spoken of led out of the defendant's yard across the patch, and crossed the second or patch fence within a few feet of where the body was lying on the outside of the patch fence. The ground about the body was covered with carpet grass. That point was in plain view from defendant's kitchen. No cockle-burrs grew outside of the patch or near the body, but such burrs grew luxuriantly along and on either side of the trail, in the patch and near the de-

fendant's yard. Witness found several cockle-burrs entangled in the hair of the deceased, which was quite long and disheveled. Witness went back to and examined the defendant's premises on the 20th of February, 1885. The house was then vacant. On the top rail of the fence, where the trail left the defendant's yard, the witness found a discoloration, produced, he thought, by blood. With his pocket-knife he pried some of this substance out of a small crack in the rail, and found it to be dry blood. The yard fence was a very low one.

Dr. W. W. Wallace testified, for the State, that it was his opinion as a physician, and as an expert in the use of shot-guns, that such wounds as those described by the witness Massey, upon the body of a woman, if fired from a shot-gun at a distance of ten or fifteen feet, would produce instant death. Witness's experience in the use of shot-guns, taught him that if nine buck shot, fired from a shot-gun, penetrated a space no larger than a man's hand, the gun must have been fired from a distance not exceeding ten or fifteen feet.

N. D. Ray testified, for the State, that he was bailiff to the grand jury at the September term, 1884, of the district court of San Augustine county. He saw the defendant standing in front of the grand jury room one day while the deceased was before the grand jury. On that occasion the defendant remarked to the witness: "I guess they (the grand jury) have got bills against me on the testimony of Sidney Ann Dykes. All I have got to say is that she will never appear to testify against me in the district court." Sheriff Gilbert testified to the same effect, and stated that the defendant was arrested on the indictments found at the September term, 1884, while that term was in session, and that the cases were called, the deceased being in attendance upon court as a witness, but they were not tried. E. H. Roberts, Jr., also testified for the State that, during the same September term, he heard the defendant say that the grand jury had indicted him for rape, but that the witness would never appear against him, as he " would come Pete Loggins on her."

J. P. Thacker testified, for the State, that during the month of November, 1884, he heard the defendant say that he thought Pete Loggins did right to kill Abe Smith; that if any person knew enough to send him, defendant, to the penitentiary, he would kill such person.

William Dykes, a brother of the deceased, testified that he was at the defendant's house about three weeks before the murder of the deceased, and saw defendant strike the deceased several times with a board. Deceased cried out, on being struck. She then went to

her mother's, across the river, but defendant went after her and
forced her to return with him.

Caroline M. Marshall, the mother of the deceased, testified, for the
State, that she lived in Angelina county at the time of the murder.
For some time previous to her death the deceased lived in one of
the old Lane houses near the residence of the defendant. Deceased
ran away from the Lane house eleven different times, and came to
witness's house, but was followed each time by the defendant and
taken back. On one occasion defendant brought one Beard and
some other men with him, and demanded the custody of the de-
ceased, saying that he had a writ for her, and that Beard was a jus-
tice of the peace. He made the deceased get up on his horse behind
him, and carried her back into San Augustine county.

Dr. Lem Boren testified, for the State, that up to the 9th day of
November, 1884, he was the family physician of the defendant. He
did not attend any of defendant's family on or about December 23d
or 24th, nor did he prescribe alcoholic liquor for defendant's wife.
Defendant once instructed witness to furnish the deceased any med-
icine she wanted, or attend her professionally when occasion re-
quired.

Joe Dubose testified, for the State, that he saw the body of the
deceased lying in a trail about thirty steps from the back part of
defendant's house. The hair, which was naturally long and usually
worn " done up," was disheveled and entangled over several cockle-
burrs. There was a gallery about three feet high on the side of
the house nearest the body. Defendant's height was about six
feet; that of the deceased about five feet six inches. The trail
which passed through the yard and patch to the point where the
body lay was one foot and six inches wide.

J. H. Dubose, Sr., testified, for the State, that from the edge of
the back gallery of defendant's house to the kitchen the distance
was about twenty feet. Witness saw the tracks of a horse going
in a northwest course from the body.

D. C. Odom testified, for the State, that he lived about one and a
half miles distant from the house in which defendant lived in De-
cember, 1884, in a northerly direction, and on the San Augustine and
Jasper road, which road ran nearly north and south. Edward Lane,
the defendant's brother, lived about two miles east of the defend-
ant, and his two brothers-in-law, Hiram and Joseph Miller, lived
within three miles southeast of him, defendant. One Meigs lived
about two miles east of defendant. On the 26th day of December,
1884, witness followed the tracks of a horse from the body of the de-

ceased about four hundred yards, in a northwest course towards the residence of Sam Williams. He was not able to follow it further because of other tracks in the trail, which trail led from defendant's house to that of Sam Williams. The witness then tracked the horse from the body around the field into the road and up to the front gate of the defendant's house. The tracks referred to started from the front gate, went around to a point near the body, and thence into the road or trail leading in a northwest course towards Sam Williams's.

Oliver Gillespie testified, for the State, that he was an eye-witness to the murder of Sidney Ann Dykes. The witness had been living at the defendant's house some two or three weeks when the killing occurred. The deceased lived about a half mile distant from the defendant's house, but she spent the day before, and the day of the killing, up to the hour of her death, at the defendant's house. The witness went with the deceased to Mr. Anderson's house on the day before the killing. The defendant sent the deceased to Anderson's on that day to file a complaint against Dick Dubose. Defendant whipped the deceased on the day before he sent her to Anderson's to make the complaint, and had often whipped her before that. The defendant left home before breakfast on the day of the killing, and went to the house of his brother Ed. He returned some time after breakfast. After he got his breakfast he left, saying he was going to Anderson's to get some whisky. He took a shot-gun with him, and rode his mother's one-eyed bay horse. Mrs. Lane, the defendant's wife, went off after breakfast, but returned to a late dinner. The deceased prepared the dinner on that day, and Mrs. Lane, her daughter Mollie, Mandy, deceased, witness and the smaller children ate dinner together. It was then getting somewhat late in the evening, but witness did not know at what hour dinner was served. The parties at dinner heard the defendant coming towards the house, running his horse and hallooing. Deceased caught up her child and fled from the house, to a point under a neighboring hill, out of sight from the house. Defendant hitched his horse at the front gate, came in and asked for the deceased. When told where she was, he ordered witness to go and summon her to the house. Witness went to deceased and told her that the defendant wanted her at his house. Deceased said: "He will kill me," but she took up her child and went back to defendant's back yard, between the kitchen and the back hall gallery on the west side of the house. Defendant came out to the gallery with his gun in his hands. Deceased stopped with her right side towards defendant. Defendant leveled his gun, took

aim and fired. The deceased fell dead, her child falling from her arms under her head. Her hair came down as she fell. Witness saw no blood. Mrs. Lane was crying when witness went after deceased, and was crying when the fatal shot was fired. After killing deceased, defendant took the head of the body, and Mrs. Lane the feet, and the two carried it to the yard fence. They let down the fence and got a quilt which belonged to witness, put the body on it, and carried it to the place in the trail where the inquest was held. Defendant then told witness to bring his horse around to him. Witness got the horse at the front gate and led him around the fence to the point where the body lay. Defendant then mounted his horse and rode rapidly off in the direction of Sam Williams's house. Mrs. Lane then told witness to catch her horse. Witness did so, and she, too, made off in the direction taken by the defendant. The witness did not know his age, and had never attended school. He did not know where defendant went to when he left. He did not hear defendant talking to his wife when he went after the defendant's horse. Witness was standing behind and near the deceased when the fatal shot was fired. Witness did not think that defendant stood more than ten feet distant from the deceased when he fired. Witness admitted that at the inquest he testified that he was down in the field, and was not present when the deceased was killed, but that statement was a lie. The State closed.

Samuel Williams was the first witness introduced by the defense. He testified that he lived about four miles west from the defendant's house, and about five miles east from J. C. Anderson's house. Witness knew that such a woman as Sidney Ann Dykes lived in the country, and heard of her death about sunset on the evening of December 24, 1884. The witness received the news from Mrs. Lane, the wife of the defendant. The defendant was at witness's house when Mrs. Lane arrived with the news of the death of the deceased. The defendant came to witness's house between 10 and 11 o'clock on that morning, riding a small blaze-faced bay mare pony, which animal was in a thin condition of flesh. He left the witness's house between 11 and 12 o'clock in company with Joe Townsend, going in the direction of James Anderson's house, and saying that he was going to Anderson's to get some brandy for his wife, who was sick, and for whom the doctor had prescribed brandy. He returned to the witness's house, riding that same pony, about a half hour before sunset on that evening. He came from the direction of Anderson's house. After getting into the house he drew a flask of liquor from his pocket and offered witness a drink, saying: " I told you a lie

this morning about my wife being sick, but I knew Anderson would not let me have the liquor unless I told him such a lie. My wife is not sick." Witness's wife then gave defendant his dinner. While waiting for one of witness's boys to get defendant some turnip greens, and after he had finished his dinner, the defendant's wife arrived, and in an excited manner told defendant that somebody had shot and killed Sidney Ann Dykes. Witness then proposed to go and inform the neighbors, and advised that defendant and his wife return home and await his arrival. Defendant declined to go home alone, as he was afraid of ambush and assassination himself. He insisted that witness should accompany him. Witness consented and went home with defendant, riding defendant's horse. On reaching defendant's house, witness proposed that defendant's wife should watch the body while he summoned the neighbors. Mrs. Lane went to and examined the body. Witness stopped at the fence, ten or twelve feet distant from the body, and presently started off after the neighbors. He had not gone far before he was first hailed and then overtaken by the defendant, who declared that he would go with witness; that he would not stay at home alone, as he verily believed parties were about there in ambush, and endeavoring to get a chance to kill him. Witness and defendant went on together to Meigs's house. Defendant had a double-barreled shotgun when at the witness's house, both on that morning and evening, and carried it with him to Meigs's house. Defendant walked and witness rode defendant's horse.

Returning to the defendant's place that night, witness lay down in the patch, behind the house, and near a fire. While there he heard the report of a gun discharged somewhere in the front of the defendant's house. He had no idea who fired that shot. The fire spoken of was built near the body by the parties who with the witness were watching the body. Defendant was not at that fire when the shot spoken of was fired. The body of the deceased lay just outside of a fence inclosing a small field. It then lay on two pillows, on the right side. The hair was considerably tangled. The nine wounds in the right side of the body were such as might have been made by small buck shot. The witness saw a track (horse?) going around the fence towards the north, and witness followed it through the brush until it entered the road running between the houses of the witness and the defendant. He was unable to trace the track further because of the multitude of other tracks over that road. The kitchen on the defendant's place was situated some twenty feet distant from the back gallery of the dwelling. The

house stood a little higher from the ground than the kitchen did. The fence around and near the house and kitchen was a very low one. The fence which inclosed the small patch stood some thirty yards further. The body lay just outside of this patch fence. The defendant's yard was perfectly clean. The witness could discover no blood about it or on the fence, nor any disarrangement of the soil indicating a scuffle. The witness saw a plenitude of cockleburrs growing on either side of the trail which led through the patch from the yard to the point where the body was lying. The defendant remained at home all of the time from the time that he and the witness returned from Meigs's on the night of December 24th, until the morning of the 26th, when witness left to go to Mr. Odom's house for breakfast. When witness returned from breakfast the defendant was gone, and witness saw no more of him for a month. Witness was in the defendant's house before day on the morning of December 26th, when defendant and Justice of the Peace Anderson were together. The inquest on the body was begun on December 26th, and was completed about an hour before sunset on the same day. Something was said during the proceedings about sending for a doctor, but it was not done.

Cross-examined, the witness said that neither he nor the defendant went to the body on the night of December 24th, for the reason that no inquest had yet been held, and witness thought it best not to track up the ground. Witness started to summon help within fifteen minutes after he arrived at defendant's house, and was gone two hours or more. The defendant stayed at home all of the night of December 24th, and was at home when Anderson arrived. He was at home on the night of the 25th, and until sunrise on the morning of the 26th, when witness left, going to Odom's. Witness did not see him again until about two weeks before this trial, when he was summoned as a witness upon the examining trial of defendant.

Re-examined by the defense, the witness stated that it was nine miles from defendant's house to Anderson's by the road, and eight miles through the woods, north of the road, leaving the road at Crawford's old school-house, and going into the road again at Pretty Prairie. The country north of the road by the woods route is rough, broken and bushy, except for a short distance about midway. The road from the witness's to the defendant's house is nearer than the route through the woods between the two places.

Mollie Lane, the defendant's daughter, was his next witness. She testified that she did not know her age. Defendant went to Ed.

Lane's house on the morning of December 24, 1884, before break-fast, and returned after breakfast. He took his gun to Ed. Lane's and brought it back. Later on that morning he left home to go to Anderson's for whisky, and took his gun with him. He rode his mother's little red blaze-faced mare. After the defendant left, wit-ness's mother and Oliver Gillespie went to Ed. Lane's house together to get a mule which the defendant left there on that morning. They returned late in the day, when they, witness, the witness's little sisters and brother and the deceased ate the dinner which wit-ness and deceased had prepared. Oliver Gillespie was sent to the bottom to see about some horses after dinner. Witness employed herself washing dishes. Mrs. Lane went into the big house, and deceased took her baby and started off, saying she was going to her home to get some clothes for her baby. Just after deceased left the kitchen the witness heard the report of a gun. She looked through a crevice in the kitchen wall in the direction of the sound, and saw the deceased lying on the ground. Witness's mother ran to the prostrate woman. Witness joined her mother at the body of the deceased as soon as she finished washing the dishes. Witness did not hear the deceased say anything, but at the request of her mother went back to the house and sent the bottle of camphor to Mrs. Lane, and then assisted to carry the pillows and quilt to where the deceased lay. Witness's mother arranged the pillows under the head of the deceased, and covered the body with the quilt, and then ordered her horse saddled, and left, saying she was going to the house of Mr. Sam Williams to report the killing of the deceased. When Mrs. Lane left, the sun was barely shining over the tops of the neighboring trees. Mrs. Lane, defendant and Sam Williams re-turned to defendant's house after dark on that same day. Defend-ant had his gun, which, on getting in the house, he stood up in the corner of the room. Witness did not see her father, the defendant, after he left that morning to go to Anderson's until he returned after dark with his wife and Sam Williams. The deceased's body lay just beyond the second fence from the defendant's house, in the direction of her own home. Oliver Gillespie was not at the defend-ant's house at the time of the killing.

Mrs. Mary Jane Lane, the wife of the defendant, testified in his behalf that the deceased was killed on Wednesday, December 24, 1884, at about 2 o'clock in the evening, just after dinner. Wit-ness went to the house of Ed. Lane at about 9 o'clock on that morning, and returned home at about high noon. After dinner, which was served about 2 o'clock, the deceased took her baby and

left defendant's house, going in the direction of her own, and saying that she was going home to get some clothes for the baby. Witness heard the report of a gun just after the deceased left defendant's house. She ran out of the house and in the direction taken by the deceased. Deceased called to her: "Don't come out here, Jane; you will get killed." Witness paid no attention to this warning, but went on to deceased, then wounded. Just before she could reach the deceased, she, deceased, fell to her knees, and witness sprang forward and caught her head. As she fell over, the deceased exclaimed: "Lord, have mercy! Uncle Seab. has killed me." Witness sent for camphor, bathed the deceased's head with it, and laid her on a pillow and quilt, and covered her with another quilt and a new Lowell bed-tick. Witness then went to the house, tied on her shoes, got a horse and went rapidly to the house of Mr. Williams, where she found the defendant. Defendant and Sam Williams came back home with the witness. Reaching home, the witness went to the body of the deceased and found her pulse still beating and her flesh still warm. The defendant and Sam Williams did not approach the body nearer than the second fence. The inquest was held on December 26, 1884, and the witness moved from her then home about a week later. Witness did not see the defendant after the day of the inquest for more than a week. The body of the deceased lay about six feet from the second fence. Defendant had his brother Ed. Lane's gun on the day of the killing, and had had it for several days. When the witness ran out to the deceased, after the shooting, she saw a man run off through the bushes, mount a horse and ride off towards Mr. Odom's house. Oliver Gillespie was not at the house when the deceased was shot, but was then horse hunting in the bottom. The defendant was not willing for the deceased to go to Anderson and make an affidavit against some one who had assaulted her a few days before the murder. The man who ran off through the bushes after the shooting was a tall man, dressed in dark clothes. His side face, which the witness saw, looked dark or black, but witness could not recognize him. It was between 9 and 10 o'clock on the morning of December 24th when the defendant left home, saying that he was going to Anderson's to get some brandy. Just before he left, witness left home, going to Ed. Lane's. She saw no more of defendant until she met him at Sam Williams's just before sunset. When witness left home to go to Ed. Lane's on that morning, her daughter Mollie and the deceased were sweeping the yard. After the return home from Williams's on the night of the murder, the witness and defendant went out of

the house to get some pine, and as they approached the fence, some one rose up in the fence corner. Defendant demanded: " Who is that?" Receiving no response the defendant fired one barrel of his gun in the direction of the fence corner. The party ran off and defendant went back into his house.

Rebecca Bryant testified, for the defense, that she saw the defendant on the 24th day of December, 1884, going in the direction of J. C. Anderson's house. He stopped at the witness's house between 1 and 2 o'clock on that day, remained about fifteen minutes, and went off in the direction of the houses of Seaborn Bryant and Sam Williams. · He left riding in a trot. Witness lived about three-fourths of a mile a little south of east from Anderson's house, on the road leading from Anderson's house to the houses of the defendant and Williams.

Eugenia Bryant, wife of Seaborn Bryant, testified that she lived about three miles from Rebecca Bryant's house, and about five miles from the house of the defendant. She was at home on the evening of December 24, 1884, and at about 4 o'clock saw the defendant pass her house, traveling from the direction of Rebecca Bryant's. He took the right hand road after passing the witness's house. That road led into the Runnels and Coleman community. Witness knew of no path or trail which connected that road with the road to Sam Williams's. The road which the defendant took did not lead to his house. The left hand road, which defendant did not take, was the road which would have taken him to Sam Williams's. He was riding rapidly; his horse, a blaze-faced bay pony, was wet with sweat, although it did not travel as though it had been pushed much. Witness was not related to the defendant. She had never discussed the murder of the deceased with him. Deceased was at the witness's house once during the summer of 1884. Defendant came after her to go to court with him. Deceased began to weep when she saw the defendant on that day, but went with him to court without objection. Defendant did not speak roughly to the deceased on that occasion. When she reached the witness's house on that day, the deceased said she was *en route* to her mother's house in Angelina county.

Bill Townsend testified, for the defense, that he saw the deceased at the defendant's house on the Sunday before she was killed. The defendant and she were then on friendly terms. Deceased had a bruise over one eye, and another on her hand, which she said were inflicted by Dick Dubose on the day before. Defendant was the witness's uncle.

The almanac disclosed that the sun set at 4:37 o'clock on the evening of December 24, 1884. The defense concluded its evidence by introducing two subpœnas summoning the deceased to appear as a witness on behalf of the defense, in cause number 1538, entitled *The State of Texas* v. *Ben Lane,* the offense charged being an assault with intent to rape.

The State introduced William Roe in rebuttal. He testified that he saw the defendant on the Monday preceding the fatal Wednesday. Defendant then had his brother Ed.'s double-barreled shotgun, which he borrowed the night before. He told witness that he wanted the gun because he had had a difficulty with a man living in the neighborhood. The defendant borrowed his mother's bay mare on the morning of the murder.

Seab. Bryant was the State's next rebutting witness. He testified that he was the deceased's uncle by marriage, and was generally called uncle by her. Witness was at home on the fatal Wednesday from 10 o'clock A. M. until 2 o'clock P. M., when he left, going to the house of Hiram Lucas, four miles distant, in Angelina county, where he stayed over night.

Hiram Lucas testified, for the State, that Seab. Bryant reached his house in Angelina county about two hours before sunset on Wednesday, December 24, 1884, and remained over night.

The motion for new trial raised, among others, the questions discussed in the opinion.

*Rufus Price* and *W. F. Davis* filed an able and exhaustive brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

WILLSON, JUDGE.    On the afternoon of December 25, 1884, Sidney Ann Dykes was shot and killed near the residence of the defendant Ben Lane, in San Augustine county. By the verdict and judgment in this case it is found and adjudged that the defendant Ben Lane committed the homicide, and that such homicide was murder in the first degree, and of so atrocious a character as to demand the punishment of death.

Defendant's counsel, in an able and ingenious brief and written argument, insists that the conviction is not supported by the evidence. In considering this question, we will first notice the circumstantial evidence adduced on the trial, grouping in a general way the inculpatory facts, without reciting the testimony in detail.

1. It was sufficiently proved that a motive existed to actuate the defendant in the commission of the murder. He had been indicted by the grand jury of San Augustine county for the crimes of rape, false imprisonment, and falsely personating an officer. These indictments were pending against him, and the deceased was a witness in behalf of the State in all three of the cases. He knew that she was a witness against him in these prosecutions, and was heard to say that she would never appear against him as a witness on the trials.

2. He had the opportunity to commit the murder, and the instrument with which to commit it. There was an effort made on the trial ·by his counsel to prove an *alibi*, but, when the testimony is closely scrutinized and analyzed, it will appear that this defense was not established. The exact hour of the homicide is not fixed by any of the witnesses, but upon comparing the statements of all the witnesses who testified as to the time, the most reasonable conclusion that we can arrive at is that it occurred soon after 3 o'clock. At precisely 1 o'clock the defendant left Anderson's house, nine miles distant by the road, from the scene of the killing. By another way, through the woods, the distance was about eight miles. He was on horseback, and left Anderson's in a trot, going in the direction of his home. Three-fourths of a mile from Anderson's, he was seen by Rebecca Bryant, at whose house he stopped and remained about fifteen minutes. This was between 1 and 2 o'clock. He left there in a trot, going in the direction of home. On the same evening about 4 o'clock, Mrs. Seaborn Bryant, who resided about three miles from Rebecca Bryant, and about five miles from defendant, saw him pass her house, coming from the direction of Rebecca Bryant's. After passing her house he took a right hand road which did not lead in the direction of defendant's house, nor in the direction of the residence of Sam Williams. He was traveling in a hurry, and his horse was covered with sweat. He was next seen at Sam Williams's residence when the sun was about one-half hour high. The sun set on that day at thirty-seven minutes after 4 o'clock. It is about four miles from defendant's home to Sam Williams's.

Now, we see from this statement of the evidence that at not later than half after 1 o'clock the defendant left Rebecca Bryant's, going in the direction of home. Premising that deceased was killed at half-past 3 o'clock, he had two hours' time within which to ride less than nine miles and commit the murder. It would not require any rapid riding to enable him to accomplish this distance in one hour and a half, thus leaving him half an hour to perpetrate the murder, and a little more than half an hour after the murder to

ride to Sam Williams's, going by the way of Seaborn Bryant's. It was neither impossible nor improbable that he could have committed the murder at 3 or half-past 3 o'clock, and still have been at the various places where he was seen on that day, and at the times stated by the witnesses. When seen by Mrs. Seaborn Bryant, at about 4 o'clock, he may have been just from the scene of the murder, and on his way to Sam Williams's, when he was next seen. It was shown that notwithstanding he took a right hand road after passing Mrs. Seaborn Bryant's, there was a road leading from that road to Sam Williams's. It is not unreasonable to suppose that he went out of his way to pass Seaborn Bryant's that he might be seen coming, not from the direction of his home, but from the direction of Anderson's, where he had gone in the morning; thus providing evidence in support of his defense of an *alibi*. It is not reasonable to suppose that he had been two hours or more traveling a distance of three miles, which must have been the case if he was on his return trip from Anderson's when Mrs. Seaborn Bryant saw him. We must conclude from this evidence that he had the opportunity to commit the murder. During all this time he was armed with a double-barreled shot-gun, which he had borrowed from his brother a few days before. Deceased was shot with nine buck shot, and buck shot are usually discharged from a shot-gun.

3. The tracks of a horse were traced from the front of defendant's house to the dead body of deceased, and from thence several hundred yards in the direction of Sam Williams's.

4. On the morning after the murder, and before the jury of inquest had completed their investigation, the defendant left his home and family, and was not seen any more in that neighborhood for more than a month, and not until he was arrested upon this charge. This is the conclusion arrived at by us from the record, though it does not definitely appear what became of the defendant after the murder, or when and where he was arrested. That he disappeared from his home on the morning after the murder is an established fact, and no witness but his wife testifies to having seen him afterwards until his arrest. She stated that she did not see him for more than a week after he left home, but she does not state when or where she next saw him, or the cause of his absence from home.

In addition to the foregoing affirmative inculpatory circumstances, there are some of a negative character which are not unworthy of consideration. There is no evidence that any one but the defendant had a motive to kill the deceased. It was in proof that one

Dubose had, a few days before her death, assaulted and beat her, but none of the circumstances of such assault are shown, nor is it shown that this man Dubose could possibly have perpetrated the murder.

Again: it was attempted by the unsupported testimony of the defendant's wife to cast suspicion upon Seaborn Bryant as the murderer. This attempt signally failed, it being proved that Bryant was at a neighbor's house at the time the murder was committed, and could not have participated in it. There was no person at defendant's house, besides himself, on the day of the homicide but women and children, and they had no gun with which to commit the murder, even if they had been capable of committing it. His wife testified on the trial that she was in the house when the gun fired; that she looked and saw a man with a gun fleeing on foot from the place where the gun fired, but did not recognize the person. He was a tall man, dressed in dark clothes. The tracks of this fleeing man are not discovered by any witness, nor is there any evidence whatever adduced, which in the least even tends to corroborate this statement of the defendant's wife.

To say the least, the circumstantial evidence before us points directly and cogently to the defendant as the perpetrator of the murder. It is not necessary that we should determine that this evidence alone is sufficient to sustain the conviction, because, in addition thereto, the witness Oliver Gillespie testified directly and positively that he saw the defendant shoot and kill the deceased. We gather from the record, and from the brief of counsel for the defendant, that this witness is a mere child, and is illiterate and ignorant. It is also shown that, when placed upon the witness stand on the examining trial, he stated that he was not present when the killing occurred, but that he was down in the field. Counsel for the defendant argue that the testimony of this witness is unworthy of belief, and that it should be entirely disregarded by this court in passing upon the sufficiency of the evidence. This court does not determine the credibility of the witnesses who testify in the trial court, or the weight to be given to the testimony. It is the exclusive province of the jury to decide these matters. "When the evidence is conflicting, and there is sufficient, if believed, to prove the case of the State, the jury being the exclusive judges of the credibility of the testimony, their verdict will not be set aside, unless it clearly appears to be wrong." (*Walker* v. *The State*, 14 Texas Ct. App., 609, and cases there cited.) The testimony of the defendant's wife and daughter conflicts materially with that

of the witness Gillespie. It was for the jury to determine the conflict, and by their verdict declare the truth of the issue. In our opinion the jury have performed this duty faithfully and intelligently. The witness Gillespie, although an ignorant child, detailed the facts of this horrible murder clearly, connectedly and minutely. His statement, upon its face, bears the impress of truth, coming as it does from an inexperienced boy. An ignorant child would not be likely to fabricate and tell so consistent and reasonable a story.

It is further to be remarked that the testimony of Gillespie is singularly corroborated by physical facts testified to by other witnesses. He stated that the defendant shot the deceased from his back gallery, she being at a distance of ten or fifteen feet from him, inside the yard fence, and standing with her right side exposed to defendant, and with her baby in her arms. It was proved that the gallery where Gillespie said the defendant stood when he fired the shot was three feet from the ground; that defendant was six feet in height, and that deceased was about five feet six inches in height. The shot holes in the body of deceased ranged slightly downward, and the nine shot holes were within a space which could have been covered by a man's hand. Thus it will be seen that the range of the shot in the body corresponds with the testimony of Gillespie as to the position of the parties at the instant the shot was fired.

The shot holes were in the right side of deceased's body. Gillespie testified that her right side was exposed to the defendant when he fired. Gillespie made the distance between defendant and deceased some ten or fifteen feet. Dr. Wallace, an expert in the use and knowledge of shot-guns, as well as an expert physician, states that the small space occupied by the nine shot holes in the body indicates that the person firing the gun was not at a greater distance from the deceased than ten or fifteen feet. Gillespie says that when the gun fired the deceased fell and died where she was standing. Dr. Wallace testified that the wounds inflicted upon her would produce instant death. Gillespie testified that defendant and his wife carried the dead body about thirty steps outside the little pasture fence and laid it where it was found by the jury of inquest. This was corroborated by the fact that the pasture through which he says the body was carried, was grown up with cockle-burr weeds, and cockle-burrs were found in deceased's hair, but there were no cockle-burrs growing outside the pasture where her dead body was found. Gillespie stated that after defendant had deposited the body outside the pasture, he called to witness to

bring his horse, and witness unhitched the horse at the front yard and led him around to the back of the pasture to the dead body, and defendant mounted the horse and rode off, saying that he was going to Sam Williams's. This was corroborated by the fact that the tracks of a horse were traced from the front yard fence around to the back of the pasture, near to the dead body, and from thence in the direction of Sam Williams's. Gillespie stated that soon after the defendant left, his wife had her horse caught, and she rode away also, saying that she was going to Sam Williams's. Williams says that soon after defendant arrived at his house, defendant's wife came, and announced the death of the deceased.

We have no hesitation in concluding from the entire evidence in the case that the jury were fully warranted in finding that the defendant fired the fatal shot. They could not reasonably have found otherwise. True it is, that the defendant's wife and daughter testify that the defendant was not present and did not commit the homicide. But, considering their relation to the defendant, and their contradictory and improbable statements, not only unsupported, but refuted by facts proved by disinterested witnesses, the jury were well warranted in disregarding their testimony.

As to proof of express malice, we think it is ample. Defendant whipped the deceased the day before he killed her, and according to Anderson's testimony he was disappointed, and displeased at her on the day of the homicide, when he ascertained that she had not instituted a prosecution against Dubose for assaulting her. He left Anderson's saying that he would have her to make the complaint against Dubose before 8 o'clock that night. The testimony of Gillespie shows that the defendant shot the deceased as deliberately as he would have shot a beast. He had her called to him, and when she presented herself with her baby in her arms, he took deliberate aim and fired the fatal shot. It was a sedate, cruel, brutal murder, the manner of its commission evincing conclusively a heart fatally bent on mischief, and regardless of social duty; a fiendish malignity and cowardly spirit that the wild savage of the plains would be ashamed to display.

As to the charge of the court, we find no material error in it. There was no evidence raising the issue of murder in the second degree, and the court very properly declined to submit that issue to the jury.

In the trial court, and in this court, the defendant has been faithfully represented by able counsel. He has, as shown by the record, had a fair and impartial trial, and although the extreme penalty of

the law has been assessed against him, the atrocity and cold-blooded cruelty of his crime justifies the punishment adjudged against him. The judgment is in all things affirmed.

*Affirmed.*

. [Opinion delivered October 21, 1885.]